# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:03CV662SNL |
| ) | |
| **CAPITAL SAND COMPANY, INC.,** ) | |
| **and M/V JAMIE LEIGH, its engines,** ) | |
| **apparel, tackle, and appurtenances,** ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

On October 6 and 7, 2004, this matter, arising under the Court's jurisdiction pursuant to 28 U.S.C. § 1345 and Rule 9(h) of the Federal Rules of Civil Procedure, was tried as a bench trial before this Court. The United States of America brings this action against Capital Sand Company, Inc., and the M/V JAMIE LEIGH. The parties completed their post-trial briefing on November 10, 2004.

## FINDINGS OF FACT

1. The case involved an allision of the M/V JAMIE LEIGH and Lock and Dam No. 25 on the Mississippi River on April 8, 2000.

2. The United States is the owner of Lock and Dam No. 25.

3. Defendant Capital Sand Company, Inc. owned the M/V JAMIE LEIGH at the time of the accident.

4. Defendants maintained that the M/V JAMIE LEIGH had been orally leased to Jefferson City River Terminal, Inc. and thus was not operated by Capital Sand at the time of the incident.

5. On September 26, 2003, this Court denied Capital Sand Company Inc.'s Motion for Partial Summary Judgment in which Defendants argued that the M/V JAMIE LEIGH had been orally leased to Jefferson City River Terminal, Inc. and that the charter bars any *in personam* claims against Capital Sand arising out of the charterer's operation of the vessel. This Court concluded that there was a genuine issue of material fact as to the existence of an agreement amounting to an oral demise charter of the M/V JAMIE LEIGH.

6. During the bench trial of the instant case, there was no testimony during the trial regarding any evidence that the M/V JAMIE LEIGH was under an oral demise charter to Jefferson City River Terminal, Inc., and therefore, the Court finds that the Defendants are fully responsible here, as opposed to someone else that may have been involved with an oral agreement.

7. Lock and Dam No. 25 is a "public work" operated for Plaintiff by the United States Army Corps of Engineers ("ACOE").

8. The M/V Jamie Leigh is a "vessel" under the Rivers and Harbors Act, 33 U.S.C. §§ 408-412.

9. A barge under the tow of the M/V JAMIE LEIGH struck and damaged a miter-gate door ("miter-gate number two") at the northern end of Lock and Dam No. 25 on April 8, 2000.

10. While under the tow of the M/V ROBERTA TABOR, one or more barges struck and damaged the other miter-gate door at the northern end of Lock and Dam No. 25 on September 27, 1999.

11. The ACOE pulled, temporarily replaced, repaired and replaced the miter-gates one and two of Lock and Dam No. 25, completing repairs on February 9, 2002.

12. The ACOE apportioned "Pull and Replacement" costs based on the percentage of Plaintiff's alleged repair costs caused by the allision involving the M/V JAMIE LEIGH relative to the total of all repair costs for both doors of the miter-gate at the northern end of Lock and Dam No. 25 as follows: (Defendants dispute the amount of the alleged damage costs.)

---

Damage Repair Costs

| | |
|---|---|
| M/V JAMIE LEIGH | $153,280.05 |
| M/V ROBERTA TABOR | $122,701.67 |
| Subtotal Damage Repairs | $275,981.72 |

Fair Wear & Tear (FW&T) Repair

| | |
|---|---|
| Total FW&T Repairs | $ 85,340.00 |

Total Repair Costs

| | |
|---|---|
| Subtotal Damage Repairs | $275,981.72 |
| Subtotal FW&T Repairs | $ 85,340.00 |
| Total Repair Costs | $361,321.72 |

Pull & Replacement Costs $300,011.82
JAMIE LEIGH Apportionment

| | |
|---|---|
| J.L. Damage Repair Costs | $153,280.05 |
| Total of All Repair Costs | $361,321.72 |
| Portion due to J.L. Damage | 42.42% (0.4242) |
| Total Pull & Replacement | $300,011.82 |
| J.L. Pull & Repair Amt. | $127,265.01 |

JAMIE LEIGH Adjusted Bill

| | |
|---|---|
| J.L. Damage Repair Amt. | $153,280.05 |
| J.L. Pull & Repair Amt. | $127,265.01 |
| M/V JAMIE LEIGH BILL | $280,545.06 |

---

13. Plaintiff initially estimated repairs to cost between $350,000 and $600,000.

14. Plaintiff calculated its damages as $303,511.53 in July 2002, and billed Defendant Capital Sand, which did not pay.

15. Plaintiff filed suit in the Southern District of Illinois on November 19, 2002. The case was transferred on Defendants' motion to the Eastern District of Missouri.

16.     On May 30, 2003, Plaintiff recalculated its damages according to the rule of HERSHEY,[1] apportioning costs commensurate to the amount of damage Plaintiff claims was caused by the M/V JAMIE LEIGH as $280,545.06, which includes labor (including overhead), equipment costs, supplies, travel, contracted services, and other expenses.

17.     Plaintiff's "Final Bill," before it was reduced after transfer to this Court, reflects ACOE actual costs of $189,344.00 for labor, $4,653.17 for travel, $117.60 for copying and other expenses, $1,368.75 for various contracted services, $3,200.00 for contracted dive services, $5,321.07 for supplies and materials, and $99,506.94 in equipment costs ("plant rental").

18.     Plaintiff's claim for $189,344.00 in labor costs includes charges for $22,702.93 in "General and Administrative" overhead ("G&A") and for $76,111.76 in "Indirect Costs" overhead. Thus, the entire overhead amount totals $98,814.69.

19.     The overhead charge was based upon a predetermined formula per Regulation and was calculated under Regulations promulgated by the ACOE and determined by employees of the St. Louis District of the ACOE.

20.     The central dispute in this case involves the issue of damages. For all practical purposes, Defendants admit fault. However, Defendants pose two main objections regarding the amount of damages. Defendants argue that they are not liable for the amount charged for direct and indirect overhead, which is a total amount of $98,814.69, broken down into $22,702.93 for G&A and $76,111.76 for Indirect Costs. Therefore, Defendants urge this Court to enter judgment in favor of Plaintiff and against the M/V JAMIE LEIGH in the amount of $181,730.33

---

[1]The rule of HERSHEY, was applied to this case after the Defendants had the case transferred to this District which reduced this demand from $303,511.53 to $280,545.06. *See*, United States of America v. American Commercial Barge Line Co. and the M/V HERSHEY, Cause No. 88-1793-C-7 (E.D.Mo., September 30, 1991) (J. Hamilton), *aff'd. on other grounds*, 988 F.2d 860 (8th Cir. 1993).

which results from the elimination of overhead charges of $98,814.69 from the claim of $280,546.06. Defendants also argue that the United States improperly failed to let the repair contract out for bids by private contractors which Defendants claim would have produced a smaller amount to repair. Specifically, Defendants argue that a private contractor could have repaired the damaged gates for approximately $194,000.00, about $86,500.00 less than the in-house charges of the Corps of Engineers. The Defendants argue that the Corps expended more than twice as many labor hours as required, and its repair rate was approximately 10% more than what a private contractor would have charged, including overhead and profit.[2] In summary, Defendants argue that the Plaintiff has not proven that damages in the amount of $280,545.06 (as reduced by the rule of HERSHEY) are fair and reasonable, but that an amount of $194,000.00 instead, which would have been charged by private contractors, would have been both fair and reasonable.

**DISCUSSION**

An injured party at admiralty has the burden of proving its damages by a preponderance of the evidence. *See* George' Radio and Television Co. v. Insurance Co. of North America, 549 F. Supp. 1014, 1016 (D.C. Md. 1982). In admiralty cases, the plaintiff's burden is "to establish that the amount claimed was reasonable and that it fairly reflected the actual costs of repairing [the damaged property.]" Id. *citing* United States v. M/V GOPHER STATE, 614 F.2d 1186, 1187 (8th Cir. 1980).

The United States has met its burden through evidence adduced at trial, and has established the nature of the damage caused by the allision of the M/V JAMIE LEIGH.

---

[2]It seems as though the Defendants assume that a private contractor would not want to recoup its overhead costs.

Lockmaster Jerry Stroud ("Stroud), structural engineer Duane Atchley ("Atchley"), and civil engineer Mike Kruckeberg ("Kruckeberg") each observed extensive structural damage to leaf number two, caused by the M/V JAMIE LEIGH which included damage to vertical I-beams and diagonal braces, and also sheared connections used to hold plastic timbers. (*See* Pl.'s Ex. 1, 2, 5, 9, Photographs USA 102-103, 107, 113-114, 119 and 139 of Ex. 15, and the color photographs reprinted from Ex. 16.)

The United States has established, through testimony and exhibits, the exact costs incurred by the Corps in repairing the damage caused by the M/V JAMIE LEIGH to leaf number two as: $189,344.00 for labor, $4,653.17 for travel, $117.60 for copying and other expenses, $1,368.75 for various contracted services, $3,200.00 for contracted dive services, $5,321.07 for supplies and materials, and $99,506.94 in equipment costs ("plant rental").[3] As Pete Coleman ("Coleman"), Stroud, and Kruckeberg testified, the Corps carefully accounted for: each hour of effort expended in repair, the cost of the operating equipment, travel to and from Lock and Dam No. 25, and the cost of supplies and materials necessary to complete repairs, dive services, and photocopying.

Once an injured party has established a *prima facie* case of damages, the burden shifts to the defendant to show that the plaintiff unreasonably failed to mitigate its damages. *See* Federal Insurance Co. v. Sabine Towing & Transportation Co., 783 F.2d 347, 350 (2nd Cir. 1985); Marathon Pipe Line Co. v. M/V SEA LEVEL II, 806 F.2d 585, 592-93 (5th Cir. 1987). The defendant must, therefore, prove, by a preponderance of the evidence, that the plaintiff was unreasonable in allowing further damage to be sustained. Id. Reasonable damages include those

---

[3]As already discussed *supra*, these charges were reduced in the aggregate to $280,545.06.

which may be needed to restore property to its previous condition.  *See* George's Radio and Television, 549 F.Supp. at 1016.

The owner of damaged property may exercise discretion in choosing the repair method which he considers best suited to restore the property to its pre-damaged state.  *See* United States v. Peavey Barge Line, 590 F.Supp. 319, 323 (C.D. Il. 1984).  As long as the course of action chosen by the plaintiff was reasonable, it may recover its damages despite the existence of another reasonable course of action that would have avoided further damage.  *See* Federal Insurance Co., 783 F.2d at 350.

Furthermore, although damages need not be established with mathematical certainty, the calculation of damages must have a reasonable basis.  *See* Computec Systems Corp. v. General Automation, Inc., 599 F.Supp. 819, 827 (D.P.R. 1984).  Damages may not be awarded on the basis of mere speculation or guesswork.  *See* Eureka Investment Corp. v. Chicago Title Ins. Co., 743 F.2d 932, 939 (D.C. Cir. 1984).

As explained *supra*, the Plaintiff established at trial that the final amount of the bill accurately reflected the work done to repair the damage caused by the M/V JAMIE LEIGH.  Additionally, through the testimony of Coleman and Kruckeberg, the Plaintiff established that the hours worked and charged in the final bill were necessary for the completion of repairs caused by the allision of the M/V JAMIE LEIGH.

Trial testimony established that the Corps, in its discretion, decided to effect repairs in-house using its own equipment and facilities.  *See* Peavey, 590 F.Supp. at 323.  Stroud and Kruckeberg, along with Tom Johnson ("Johnson") and Coleman each testified that the Corps is tasked with maintaining leaf number two of Lock and Dam No. 25, and other miter- gates just like it, and that the Corps maintains equipment and trains its employees to be able to maintain the

miter-gates. Johnson and Kruckeberg testified that the Corps could have "gone commercial" with respect to repairing the miter-gate leaf, and that the Corps has used commercial contracts in the past. Kruckeberg testified from his own experience that it would have faced increased costs and would have had less control over the repair process if the Corps had used contracted repairs, and he explained that he and Johnson decided not to employ commercial contracting procedures in this case. In fact, Johnson testified that the Corps' experience with commercial contracts includes a disturbing history of contractor cost overruns and delays in those commercial repairs, which supports the reasonableness of the Corps' decision to manage repairs using its own resources.

Coleman, a Corps laborer and the Service Base General Foreman explained the level of effort needed to effect both Pull and Replace operations and to perform the chore of cropping out and replacing heavy steel I-beams and diagonal gate stiffeners. Coleman testified about the 87-ton weight and 1500 square feet of "sail area" on each gate leaf, and that it took a team of workers familiar with the process three or four days to build up a temporary gate. Defendants' sole witness, David Mayberry ("Mayberry"), a marine surveyor, opined that the work could have been done with fewer men in one single eight hour day. If Mayberry was correct, this would mean that the total cost of damage could have been smaller.

During the trial, Coleman explained why each and every piece of plant equipment was necessary in the Pull and Replacement operations, and he explained that he kept careful track of the time and effort of the dozen workers with which he was charged with supervising. (*See*, Pl.'s Ex. 29, tab "1-A's"). Also during the trial, Stroud explained how he and his crew in Winfield helped out in the Pull and Replace operations. The Defendants' witness, Mayberry, failed to account for these hours in his estimate. Like Coleman, Stroud documented the work done by his

crew, ensured the accuracy of those figures, and forwarded them for inclusion in the final bill using CEFMS, the Corps' Financial Management System database.

Kruckeberg discussed the careful measures he used throughout the entire repair process to ensure that only charges which related to the repair of damage resulting from the M/V JAMIE LEIGH, not fair wear and tear anywhere, nor repairs caused by the M/V ROBERTA TABOR at leaf four, were billed to Capital Sand. (*See*, Pl.'s Ex. 7, 25, and 29.) Coleman and Kruckeberg testified that each piece of equipment used, every tradesman employed, and each hour of time spent was necessary. Coleman and Kruckeberg supported their testimony with the business records completed in the course of the Corps' regular business.

Defendants have not met their burden of proving that the damages charged by the Corps are unreasonable. Through the testimony of Mayberry, Defendants presented an estimate for repairs that was created by Mayberry with hindsight, several months after the repairs were actually completed. Mayberry has estimated that the Corps expended more than twice as many labor hours as required, and its repair rate was approximately 10% more than what a private contractor would have charged. His estimate, however, is precisely that--an estimate. *See e.g.*, United States v. American Boat Co., Inc., Civil No. 00-438-GPM at 12-13 (S.D. Il. January 8, 2002) (awarding the Corps' full costs in a lock and dam case involving roughly $320,000 in labor and plant rental charges). It cannot, in itself, prove that the hours worked by the Corps were unreasonable.

Although Mayberry testified that some contractor would have performed the necessary work for $194,000.00 in about half of the time, he admitted during cross-examination that he could not identify which, if any, of the 2761 hours actually worked by the Corps were "unnecessary." Defendants' expert also admitted that his "specifications" did not afford the same

level of safety as the Corps' established practices. Finally, Mayberry admitted that he has never performed or supervised the types of repairs involved in this case. Hence, Defendants have failed to show that the Plaintiff unreasonably failed to mitigate its damages.

In addition to arguing that the amount of damage was neither fair nor reasonable, Defendants also argue that they are not responsible for the overhead expenses charged in the amount of $98,814.69 (comprised of $22,702.93 for G&A and $76,111.76 for Indirect Costs). Overhead expenses include those expenses that are necessary to keep a company or organization functioning as a going concern and that cannot be easily identified with any individual product or repair project. *See*, United Electrical, Radio and Mach. Workers v. Oliver Corp., 205 F.2d 376, 387 (8th Cir. 1953). "Overhead serves to reimburse a party for its general operating expenses, which are composed of costs that are not directly allocable to a particular project." Peavey, 748 F.2d at 399. "Increased overhead and indirect expenses are compensable, but only where there exists justification for awarding these costs." United States v. M/V GOPHER STATE, 614 F.2d at 1189. *See also*, United States v. Commerical American Barge Line Co., 424 F.Supp. 453, 456 (E.D.Mo. 1977); United Electrical Workers v. Oliver Corp., 205 F.2d at 388.

"This Court recognizes that reasonable overhead expenses can be included in the cost of repairs even if the injured party makes the repairs itself." Shappert Engineering Co. v. Steel City Marine Transport, Inc., 620 F.Supp. 1377, 1380 (E.D. Mo. 1985) *citing* Peavey, 748 F.2d at 399. Courts in several federal jurisdictions, including this one, have held that plaintiffs are entitled to recover overhead expenses as an element of damages in connection with the cost of repairs or replacement in cases where the property had been damaged by the defendant. Ford Motor Co. v. Bradley Transp. Co., 174 F.2d 192 (6th Cir. 1949); Bultema Dock & Dredge Co. v. S.S. David P. Thompson, 252 F.Supp. 881 (D.C. Mich. 1966); Baltimore & Ohio R. Co. v. Commercial

Transport, Inc., 273 F.2d 447 (7th Cir. 1960); Peavey, 748 F.2d 395; Shappert, 620 F.Supp. 1377; Department of Water & Power v. United States, 131 F.Supp. 329 (D.C. Cal. 1955).

In the case at bench, the overhead charges were based upon a predetermined formula per regulation and were calculated pursuant to regulations promulgated by the Corps. During the trial, accountants Rosemary Craig ("Craig") and Steve Huskey ("Huskey") testified that the statutory basis for collecting overhead was also published in the Corps' overhead regulations at page 19, of Chapter 19 of Engineer Regulation 37-2-10. (*See* Pl.'s Ex. 21 and Defs.' Ex. YY.) They also testified that they personally and regularly checked overhead calculated rates to ensure that the Corps' Revolving Fund was properly recouping overhead costs (neither too much nor too little) to stay within 1% by the end of the fiscal year. They made adjustments to those rates as necessary to honor the express intent of Congress that the Corps' overhead charges be recovered.

Craig linked the role of administrative offices, comprising G&A overhead, to actual repairs at Lock and Dam No. 25. Huskey similarly linked indirect charges for electricity, small tools, welding supplies, etc., to the actual repairs. However, on cross-examination, it was revealed that despite such "linking" of the costs, the overhead charged by the Corps represents a percentage of the Corps' unrelated costs that are not directly attributable to the repair project resulting from the allision of the M/V JAMIE LEIGH, which is unsurprising given that overhead is not directly allocable to particular projects. United States v. Peavey Barge Line, 748 F.2d 395, 399 (7th Cir. 1984). Huskey further explained that overhead charges in this case were typical of those for similar repair projects.

Plaintiff's witness, Scott Gray ("Gray"), an accountant, testified that the work done by the Corps at Lock and Dam No. 25 included overhead, but that the Corps did not layer the overhead

charges. Gray also testified that the 109% total overhead charged by the Corps is both reasonable and consistent with the norms of industry in terms of the method used and the rates charged.

In an effort to reject the overhead costs, Defendants place their reliance on GOPHER STATE, 614 F.2d 1186 (8th Cir. 1980) which explains that overhead charges are allowable, but only where there exists justification for awarding these costs. Id. at 1189-90. The Eighth Circuit in GOPHER STATE agreed with the trial court below which found that overhead charges were not allowable because they were not based upon the actual expenditures of overhead items related to the accident. Id. In effect, GOPHER STATE holds that if overhead is not directly related to the repair work, it is not allowable. However in GOPHER STATE, the Eighth Circuit also agreed with the district court which found the "additional overhead charge to be both arbitrary and 'overhead on overhead.' In essence, payment of this charge would result in double recovery which we believe the district court properly refused to consider." Id. at 1189. The Eighth Circuit in GOPHER STATE also was troubled by the fact that the Corps estimated repair costs around $100,000, but billed at over $150,000. Id. at 1188. (noting a "gross disparity" represented by a 544% increase between estimated and actual overhead charged that was "ridiculous on its face [and] undoubtedly influenced the trial court...")

In this case, unlike GOPHER STATE, we do not have any "overhead on overhead" or concerns of "double recovery." During the bench trial, Gray testified that there was no layering of overhead in this case, and Defendants have not offered evidence that there was a layering of "overhead on overhead" in this case. Nor do we have any inflated mark-up between the estimated damages and the actual damages; in fact, the actual damages, $280,545.06, are lower than the original lowest possible damage estimate of $350,000. Finally, this Court cannot possibly fathom the difference between "damage" that is related to the actual repairs and "overhead" that is related

to the actual repairs. If anything is related to the actual repairs, then surely we must be speaking entirely of "damage." The Seventh Circuit's definition of overhead illustrates the point, "[o]verhead serves to reimburse a party for its general operating expenses, which are composed of costs that are not directly allocable to a particular project." Peavey, 748 F.2d at 399. Basically, if GOPHER STATE, 614 F.2d 1186, is interpreted to mean what Defendants suggest, then overhead by its very nature is *never* allowable, yet the Corps regulation which quotes the Federal statute, 33 U.S.C. § 576, actually *requires* the Corps to collect its overhead expenses. (*See*, Ex. 21, Engineering Regulation 37-2-10, Chapter 19 at 19-1).

The United States counters the Defendants' argument, stating that there are later cases after GOPHER STATE that allow overhead charges even though there is no proof that shows those charges are directly related to the repairs made. *See, e.g.*, Peavey, 748 F.2d at 399-401; Avondale Industries, Inc. v. International Marine Carriers, 1995 WL 312066 (E.D. La. June 10, 1996) (Not Reported in F.Supp.). As recently as 1991, the Eastern District of Missouri in HERSHEY allowed recovery of overhead at 110%, which is almost exactly the same as the 109% overhead amount in this case. *See supra* p. 4 n. 1.[4]

In looking at the recent caselaw coupled with the evidence adduced at trial that the overhead was determined carefully without any layering or double recovery, and pursuant to applicable regulations, this Court finds that the overhead costs are reasonable. Thus, they should be awarded in this case. Accordingly, the United States should recover the full amount of its bill, $280,545.06.

---

[4]In fact, Defendants relied on HERSHEY when it led to a reduction in the damage bill from $303,511.53 to $280,545.06.

The United States has also asked for an award of pre-judgment interest which is customarily awarded in admiralty cases unless there are exceptional or peculiar circumstances. *See* Mid-America Transp. Co. v. Rose Barge Lines, Inc., 477 F.2d 914, 916 (8th Cir. 1973); United States v. M/V GOPHER STATE, 614 F.2d at 1190. Peculiar circumstances can be found when "the party requesting interest has (1) unreasonably delayed in prosecuting its claim, (2) made a bad faith estimate of its damages that precluded settlement, or (3) not sustained any actual damages." Bankers Trust Co. v. Bethlehem Steel Corp., 658 F.2d 103, 108 (3rd Cir. 1981).

In this case, the Court does not find any peculiar circumstances precluding the award of pre-judgment interest; Plaintiff has not unreasonably delayed, made a bad faith estimate, nor has it fabricated damages. To the contrary, testimony revealed during the bench trial that the Plaintiff carefully accounted for the damage and made such necessary repairs accordingly.

The Plaintiff made its final decision on the amount of total damage when it reduced that amount pursuant to HERSHEY on May 30, 2003. In fact, Defendants have argued in their post-trial brief that if prejudgment interest is permitted, it should begin on May 30, 2003, because that is when the Plaintiff "finally decided upon its damages." *See*, Defs.' Post-Trial Br. at 15. This Court agrees, and therefore, the United States is entitled to prejudgment interest beginning on May 30, 2003.

Additionally, 2.25% is the rate to which all parties stipulated as the effective interest rate on February 9, 2002, (the date repairs were completed) and the Court sees no reason why that rate should not be applied to the date of May 30, 2003, as well. *See id.*; Peavey, 748 F.2d at 401-402. Neither Plaintiff, nor Defendants, have argued in their post-trial briefs that any other rate should apply to an award of pre-judgment interest in this case. Accordingly, the United States is entitled to prejudgment interest from May 30, 2003, at the rate of 2.25% per annum.

Furthermore, Plaintiff seeks a statutory penalty of $25,000 under 33 U.S.C. § 411. With respect to the penalty claim to be assessed, the Court recognizes that under the Rivers and Harbors Appropriation Act, a vessel striking a government structure may be assessed a penalty of up to $25,000. 33 U.S.C. § 411. In lock damage cases, which are fairly common, a penalty of $500 to $1,000 is typically assessed against vessels that inadvertently strike a lock gate as occurred in this case. *See, e.g.*, GOPHER STATE, 472 F.Supp. 556, 558 (E.D. Mo. 1979) ($1,000); American Commercial Barge Line Co., 424 F.Supp. at 556 ($500); Untied States v. Tug Otto, 296 F.Supp. 1130, 1134 (S.D. Tx. 1967) *aff'd.*, 404 F.2d 54 (5th Cir. 1968) ($500); Untied States v. The M/V MARTIN, 198 F.Supp. 171 177 (S.D. Il. 1961) *aff'd.*, 313 F.2d 851 (7th Cir. 1963) ($1,000). This is a typical lock damage case, with no evidence that the allision resulted from anything more than navigational error, and accordingly, a penalty of $1,000 against Defendants is warranted.

Finally, this matter is before the Court on two Motions. The Plaintiff has filed a Motion in Limine to Exclude Opinion Testimony of Defendants' Witnesses Weis and Smith (#53). Given that Defendants called neither witness, the Motion in Limine is moot and it should be denied as such. The remaining motion before this Court is Defendants' Motion for Payment of Expert Deposition Costs associated with Mayberry's deposition (#61) to which Plaintiff has responded in opposition, and Defendants have replied. Apparently, Plaintiff has paid $924.00 to Mayberry, which includes Mayberry's actual travel costs, 1.2 hours in travel time, and six hours of preparation and testimony time; but Defendants contend that Mayberry is also entitled to an additional $850.00 which includes payment for additional preparation time in excess the hours of preparation time that he was already paid. Pursuant to Rule 26(b)(4)(C) of the Federal Rules of Civil Procedure, Mayberry is entitled to a reasonable fee, which this Court determines that the

Plaintiff has already paid to him in the amount of $924.00. *See* FED. R. CIV .P. 26(b)(4)(C).

Therefore, the motion for additional payment of expert costs should be denied.

## CONCLUSIONS OF LAW

1. Jurisdiction of the Court is not disputed and is based on the Court's admiralty and maritime jurisdiction, as set forth in 33 U.S.C. § 408 and Rule 9(h) of the Federal Rules of Civil Procedure.

2. This is an action for damages brought by the United States under the Rivers and Harbors Appropriation Act, 33 U.S.C. § 408 *et seq*.

3. Defendants are liable for damages resulting from an allision of the M/V Jamie Leigh and Lock and Dam No. 25 on the Mississippi River on April 8, 2000 in the total amount of $280,545.06.

4. In admiralty cases involving claims of damage to property, the plaintiff bears the burden of proving that the amount claimed is reasonable and that it fairly reflects the damages sustained.

5. Plaintiff is entitled to pre-judgment interest from May 30, 2003, at the rate of 2.25% per annum.

6. Defendants shall be assessed a penalty of $1,000 for the allision.

7. **IT IS HEREBY ORDERED** that Plaintiff's Motion in Limine to Exclude Opinion Testimony of Defendants' Witnesses Weis and Smith be and hereby is **DENIED** as moot (#53).

8. **IT IS FINALLY ORDERED** that Defendants' Motion for Payment of Expert Deposition Costs be and hereby is **DENIED** (#61).

## JUDGMENT

The Court enters judgment in favor of Plaintiff United States of America and against Defendants Capital Sand Company, Inc. and the M/V JAMIE LEIGH in the amount of $280,545.06.  The Court also enters judgment in favor of Plaintiff United States of America and against Defendants for pre-judgment interest from May 30, 2003, at the rate of 2.25% per annum.  Lastly, the Court assesses a penalty of $1,000 against Defendants.

Dated this  18th  day of July, 2005.

*/s/ Stephen N. Limbaugh*
SENIOR UNITED STATES DISTRICT JUDGE